IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:22-cv-02001-DDD-SBP

THE KONG COMPANY, LLC,

      Plaintiff,

v.

BOUNCE ENTERPRISES, LLC;
KSP USA, LLC; and
JOSEPH MARKHAM,

      Defendants.

---

ORDER DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
ON TRADEMARK CLAIM AND CONTRACT COUNTERCLAIMS

---

Plaintiff The Kong Company, LLC has filed suit against Defendants Bounce Enterprises, LLC; KSP USA, LLC; and Joseph Markham alleging, among other things, trademark infringement. The defendants contend that in November 2021, Kong entered into a trademark licensing agreement with Bounce or KSP, but Kong contends that no binding agreement was ever formed. The defendants bring four counterclaims based on the premise that the parties entered a valid and enforceable licensing agreement, or that the defendants reasonably relied on Kong's promise to do so. Kong moves for summary judgment on its trademark-infringement claim and the defendants' counterclaims. Doc. 82. For the following reasons, the motion is denied.

### RELEVANT FACTS[1]

Kong designs, manufactures, and sells pet products throughout the United States. Bounce is a holding company that holds equity interests in both Kong and KSP. Doc. 93-2 at 3. Mr. Markham is one of the founders of Kong and the inventor of the popular snowman-shaped "KONG" dog toy. Doc. 75 at 18; Doc. 76 at 1. It appears that Mr. Markham is a 50% owner of Kong, either directly or via his ownership of Bounce, though the record is not entirely clear on that point. *See* Doc. 27 at 2; Doc. 75 at 2, 4, 18; Doc. 76 at 1-2. Mr. Markham has been one of Kong's managers since 2005. Doc. 87 at 5; Doc. 92 at 2 Doc. 75 at 20; Doc. 76 at 4. Kong is also managed by John Nelson. Doc. 75 at 20; Doc. 76 at 4. Kong owns numerous registered KONG trademarks.

### I.   Triangle Agreements

In July 2019, Kong, Bounce, and an entity called KVP International, Inc. entered into a set of agreements the parties call "the Triangle Agreements." Mr. Nelson is the president of KVP, and he, Mr. Markham, and Kong's president, Kathy Decker ("KD") Frueh, all own shares of KVP. Pursuant to the Triangle Agreements, Bounce would develop and manufacture products for zoo and other non-domesticated animals, and KVP would have the exclusive right to market and sell those products. One of the Triangle Agreements was a trademark licensing agreement between Kong and KVP. That agreement provided that KVP could only use KONG trademarks on products that Kong approved. During

---

[1]   The following facts are undisputed unless otherwise noted. Absent citation to another part of the record, these facts are drawn from the parties' statements of material fact. *See* Doc. 82 at 2-7; Doc. 93 at 6-12; Doc. 97 at 2-4. In this Order, all pinpoint citations to the record use the blue page number appended by the Court's Electronic Case Filing system at the top of each page, which may differ from a document's internal pagination.

the term of the Triangle Agreements, KVP marketed and sold certain
KONG-branded products, though the parties dispute precisely which
products, and they also dispute whether Kong had approved those prod-
ucts. Doc. 82 at 3; Doc. 93 at 3, 10; Doc. 97 at 3. KVP made thousands of
dollars of royalty payments to Mr. Nelson, Mr. Markham, and
Ms. Frueh.

## II.  November 3, 2021 Meeting

Within a couple of years, disputes arose between Kong, Bounce, and
KVP concerning the Triangle Agreements. The parties met in person on
November 3, 2021.

According to Kong, at that meeting they agreed to terminate the Tri-
angle Agreements, and Kong advised Bounce that it was willing to enter
into a new trademark licensing agreement with KSP under the same
terms as its previous agreement with KVP. Doc. 82 at 4; *see also*
Doc. 82-10; Doc. 82-11 at 164. Mr. Nelson testified that his understand-
ing following the November 3 meeting was that:

> KVP basically went away and there's going to be a new re-
> lationship between KONG and KSP. . . . You change KVP
> to KSP and I'll sign it. Don't make any other changes. I'm
> not going to negotiate anything. This has to be the same
> format we always use; KSP instead of KVP. That's what I
> agreed to.

Doc. 82-11 at 164.

According to the defendants, Bounce would not have agreed to termi-
nate the Triangle Agreements but for Kong's agreement that the parties
would continue their business relationship with KSP taking over for
KVP. Doc. 93 at 7. Mr. Markham testified that his understanding fol-
lowing the November 3 meeting was that KSP would "step into th[e]
shoes" of KVP, and the new agreement between Kong and KSP would
"follow in the same guidelines" as the old agreement between Kong and

KVP. Doc. 93-4 at 5, 7. According to Mr. Markham, the parties "already assumed that [KSP] had" a license from Kong following the meeting, and:

> We were just going to be moving forward with the formality of the paperwork . . . . We agree we're doing this. We're going forward. . . . [W]e absolutely were moving forward. There was no assumption that we were moving forward. We were moving forward. Everybody was in agreement with what we were doing. . . . There was never any ambiguity about us having a license to move forward.

*Id*. at 10, 13-14. Mr. Markham testified that:

> [T]here were a few other terms that weren't pertinent to the agreement that needed to be specific for . . . Bounce versus KVP. . . . I think it was—if we presented a product to KONG and they decided to decline that product, that we would have a way to do something else with it. They would have the option on any product that we developed. But if they chose not to take it, for whatever reason, then we had the option to sell it somewhere else.

*Id*. at 11. According to the defendants, Mr. Markham and Mr. Nelson "would regularly agree on matters and complete the paperwork documenting the agreement later," but Kong disputes this. Doc. 93 at 12; Doc. 97 at 4.

On November 3, 2021, after the meeting, Mr. Markham sent an email to Kong's counsel, Andrew Dallmann, advising him that:

> KONG and Bounce desire to move forward using a new agreement the same as or close to the standard Trademark Licensing agreement that was in place with KVP. I believe I speak for all when I ask to officially terminate the other agreements and draft a Trademark Agreement between KONG and Bounce.

Doc. 93-7 at 2. Mr. Nelson responded "agree." *Id*. According to Mr. Nelson, he immediately instructed Mr. Dallmann to draft a new trademark licensing agreement that "change[d] the 'V' to an 'S.'" Doc. 82-6.

### III. Parties' Course of Conduct After November 3, 2021

On December 14, 2021, Mr. Markham sent an email to Mr. Nelson and Ms. Frueh, proposing "some specifics we think should be included in the new agreement (s)." Doc. 82-12 at 2. Ms. Frueh responded on December 19 with her questions and comments inserted in italics into the body of Mr. Markham's December 14 email:

> We have looked at the existing agreements with a desire to keep things as simple as possible.
>
> Here are some specifics we think should be included in the new agreement (s)
>
> The parties: KONG SPECIALTY PRODUCTS (KSP) and KONG LLC
>
> Specifics:
>
> KSP desires to manufacture and sell KONG Specialty Products, world-wide.
>
> Markets: Equine, Agriculture, Zoo, Aquamarine, Police, Military, and Sporting dog Training Suppliers. *This may mean KSP and KONG are selling to the same suppliers in the Professional dog world and Farm / Fleet. We should consider how we don't confuse markets and distributors around the world and positioning*
>
> RE Equine and Ag Market.
>
> Equine and Ag markets = Tack Shops, Farm, Feed, and Ranch Stores as well as catalog and Internet equine and Ag product suppliers. IE horse and agriculture product suppliers and orgs. 5% ROYALTY *On KSP net sales?*
>
> Zoo and Aquamarine facilities, suppliers and orgs.
>
> We propose no royalty be paid to KONG on products sold exclusively for internal use by Zoos and Aquamarine animal facilities. *agreed*
>
> ZOO Gift Shops 5% Royalty will be paid on net sales (KSP's Selling Price) on all Specialty products sold to Zoo gift shops for retail sales.

Exception: EG; gift shop might offer customers the opportunity to purchase a KONG Zoo product to gift to a zoo animal. No royalty payments on these purchases.

> *Not sure I follow the execution. Once KSP invoices a gift shop, how will it be communicated that something was purchased to gift to a zoo animal? It would seem that the KSP invoice to the shop would be the same $$ amount. The shop can sell at whatever price or use they want?? Or is there a special donation program referred to at time of KSP invoice to shop*

KSP: products for initial approval. KONG EQUINE kit, 12 KONG and components, KONG 8 Kit and components, Luna Rings, Luna Ball, ProBalls, ZOO balls. Rollers and DumbBells.

> *Can you clarify what the Luna Ring and Ball is? As well as the Rollers? I'm not remembering them*
> *We need to clarify the Proball launch and packaging. I'm assuming there's just one version of the Proball and packaging*

Okay to have Andrew start drafting this?

*Id.* at 2-3.

On January 6, 2022, Ms. Frueh met with KSP's HR manager, Myndi Rohweder. On January 11, Ms. Rohweder sent Ms. Frueh an email with the subject line "notes from last Thursday," in which she listed four documents they had discussed. Doc. 82-13. Ms. Rohweder noted that the signed termination of the Triangle Agreements was "emailed to you last Thursday," and that the two had discussed the "Product Pre-approval" section of the trademark licensing agreement, including an addendum "with list of products already in production and approved." Doc. 82-13 at 2. She also included notes regarding their discussion of an "Option Agreement," and an exclusive distribution agreement for a product called the "Pro-Ball." *Id.* at 2-3. Ms. Rohweder stated that "[t]hose are my notes from our discussion. . . . I think it will be great to get the Licensing and Option agreements taken care of." *Id.* at 3.

- 6 -

After the termination of the Triangle Agreements, KVP transferred its websites and social-media accounts relating to the sale of Bounce's products over to the defendants. The defendants continued to use those websites and social-media accounts to market and sell various products using KONG trademarks. The parties dispute whether Kong had approved the use of its trademarks on those products, either during the term of the Triangle Agreements or during the parties' discussions regarding KSP replacing KVP. Doc. 82 at 5-6; Doc. 93 at 9, 11; Doc. 97 at 4.

On January 27, 2022, Ms. Rohweder forwarded Mr. Markham the email she had sent to Ms. Frueh on January 11, stating "Here is the email I had sent to KD regarding changes in the agreements before they should be signed. I will scan and attach the agreements for reference. We should get them to a lawyer so we can sign and send to KONG." Doc. 82-15 at 5. Mr. Markham forwarded that email to Mr. Dallmann, stating "Please prepare these docs to include the changes noted. When they are done I will sign and send them to KONG for John[ Nelson]'s sig. Let's discuss." *Id.* Ms. Rohweder then sent Mr. Markham a separate email attaching a draft trademark licensing agreement between Kong and KSP with her handwritten notes and markups from the January 6 meeting with Ms. Frueh, as well as her notes and markups to a draft option agreement and draft exclusive distribution agreement; Mr. Markham forwarded that email to Mr. Dallmann. Doc. 82-14 at 2, 5-16. Ms. Rohweder had made the following notes concerning the "Royalties" section of the agreement: "concessions subject to royalty," "zoo gifting," "KSP gets paid then royalty," and "first right of refusal." *Id.* at 9.

On February 3, 2022, Kong sent the defendants a letter stating:

> Bounce has no current right, authority or license to market, sell and distribute any products using any of the

KONG® marks because Bounce does not have a license with KONG® to use its marks or any IP rights. . . . KONG® demands that Bounce confirm it will immediately cease and desist in the use of the KONG® name and or any of KONG®'s marks, trade dress, design patents, or other IP rights.

KONG® is willing to continue negotiations with Bounce related to Bounce's use of the KONG® name and mark. Until the parties can come to terms, however, Bounce has no right to use the KONG® name, marks or trade dress. Please confirm that Bounce will make no further use of the KONG® name, marks or trade dress until or unless the parties can agree on the terms of use of KONG®'s intellectual property.

Doc. 82-25 at 2-3.

On February 5, 2022, Mr. Dallmann sent Mr. Markham redlines to the draft trademark licensing agreement. Doc. 82-15 at 4. On February 7, Mr. Dallmann sent Mr. Markham additional redlines to the licensing agreement and other agreements, stating "I think the license agreement is pretty close," but "the distribution agreement is tricky as to the reversion back" regarding "[t]he Pro Ball [that] has the KONG logo," because "If it reverts back does that include a license to the mark?". *Id.* at 3. After some discussion, on February 8 Mr. Markham and Mr. Dallmann settled on the following language for the ProBall distribution agreement: "As to the Pro Ball, KONG shall have until July 1, 2022, to begin commercializing said product after which it shall revert back to Bounce under the terms of the parties' separate trademark license agreement." *Id.* at 2.

On February 10, 2022, Mr. Markham provided Kong a draft trademark licensing agreement between Kong and Bounce[2] that he had signed on behalf of Bounce. Doc. 82-16. In addition to changing the licensee from KVP to Bounce and adding an Exhibit A with a list of pre-approved products, the new agreement added a provision regarding the separate ProBall distribution agreement, which stated that Bounce "shall have the right to commercialize any . . . products [covered by the distribution agreement] in the dog/pet space" if Kong did not do so. *Compare* Doc. 82-2 at 2 (July 17, 2019 agreement between Kong and KVP), *with* Doc. 82-16 at 2 (Feb. 10, 2022 draft agreement between Kong and Bounce). It also added Mr. Markham, Ms. Frueh, and Kong's "marketing group" to the list of Kong employees to whom new product-approval requests could be submitted. *Compare* Doc. 82-2 at 2 (listing only Mr. Nelson), *with* Doc. 82-16 at 2. The remaining terms, including the royalty rate and payment provisions, appear to be identical between the two agreements. *Compare* Doc. 82-2 at 2-7, *with* Doc. 82-16 at 3-8.

On February 15, Ms. Rohweder sent Kong a follow-up email "[c]ircling back to conversation regarding the Mega Wubba that KVP has been selling as part of the KONG Equine line," and "wondering if this product needs to be included in the licensing agreement? . . . I believe

---

[2]    The parties seem to have treated Bounce and KSP somewhat interchangeably in their discussions. As noted above, both Mr. Nelson and Mr. Markham testified that at the November 3, 2021 meeting they discussed KSP stepping into the shoes of KVP, yet Mr. Markham's email to Mr. Dallmann that same day (to which Mr. Nelson responded "agree") stated that they wanted to "draft a Trademark Agreement between KONG and Bounce." In its cease-and-desist letters, Kong addressed Bounce as "Bounce (a/k/a KSP)" and "Bounce, Inc. (a/k/a KONG Specialty Products or KSP)." Doc. 82-25 at 2; Doc. 82-6 at 2. In their answer, the defendants refer to the two entities together as "Bounce/KSP," *see, e.g.*, Doc. 75 at 5, 6, 27-29, 34-36, and Kong does the same at times in its briefs, *see, e.g.*, Doc. 82 at 4-5.

one step we can take is to get the licensing agreement completed and signed." Doc. 82-17 at 2. On February 21, Ms. Frueh responded that:

> You are correct. KSP will need to be given authority to sell or market anything with the KONG name on it. The contracts still need to be discussed. . . . Right now John [Nelson] won't even discuss the new trademark contracts with me until some of the other big issues are cleared up. Lots of mud still in our way . . . .

*Id.* at 2.

According to Mr. Markham, those "other big issues" referenced by Mr. Frueh included a separate dispute regarding whether Ms. Frueh should receive a fee from the proceeds of a real-estate sale made by another Kong entity, and Mr. Nelson "tried to hold hostage this [trademark licensing] agreement, PROBall, everything" pending resolution of the real-estate dispute. Doc. 93-4 at 12; *see also* Doc. 93-8 at 11-12. The parties also apparently had an ongoing dispute regarding whether Kong should be paying Mr. Markham a monthly fee to help with KSP's operations. Doc. 93-8 at 11. According to Mr. Nelson, "it is fair to say . . . in that time frame of early 2022 that the parties on a variety of issues were in the process of lawyering up and starting to argue with each other over various issues." *Id.* at 12. But it was "just coincidence" that "in the middle of all those arguments about KONG and its operations . . . KONG sent a cease-and-desist letter" to Bounce regarding Bounce's use of Kong's trademarks. *Id.*

On March 10, 2022, Kong sent a second cease-and-desist letter to Bounce regarding Bounce's continued use of Kong's intellectual property, stating that "[w]hile KONG® and Bounce have had discussions concerning Bounce's use of KONG's intellectual property, there is presently no [licensing] agreement in place." Doc. 82-26 at 2. On March 18, 2022, Bounce filed a lawsuit in state court against Kong, Mr. Nelson, Ms. Frueh, and two related entities regarding the disputed

real-estate transaction, alleged breaches of Kong's operating agreement and governance documents, and alleged breaches of what Bounce contends is a valid and enforceable trademark licensing agreement entered between it and Kong on November 3, 2021. *See* Doc. 82-27 at 2; Doc. 70 at 3-5 & n.1, 14 n.3; Doc. 29-3.

On April 12, 2022, the parties entered into a tolling agreement in which they agreed that:

(1) Bounce would dismiss the state-court lawsuit without prejudice "while the Parties engage in discussions and formal mediation to attempt to resolve the Dispute";

(2) Any statute of limitations relating to the parties' disputes would be tolled through May 31, 2022, and no party would file a lawsuit during that time;

(3) Kong could continue to operate throughout the tolling period;

(4) Although Kong agreed not to file a lawsuit during the tolling period, it was "not agreeing to and is not providing any license, consent or other authorization for Bounce's, or its affiliates, prior and continuing use of KONG's intellectual property";

(5) "Bounce, and its affiliates, agree that it will not use this Tolling Agreement . . . as evidence that KONG has consented or acquiesced to Bounce, and its affiliates, use of KONG's intellectual property"; and

(6) Bounce would "not market any products using KONG's intellectual property that are not currently marketed as of the date of this Agreement" and would "not sell or deliver any products that use KONG's intellectual property to customers or vendors that are not current customers of Bounce."

Doc. 82-27 at 1-7.

## IV. Claims Asserted in this Case

The parties' attempt to mediate their disputes was unsuccessful. Ultimately, Bounce refiled its state-court suit against Kong and others on August 2, 2022, Doc. 29-3, and Kong filed this suit in federal court on

August 9, 2022, Doc. 1.[3] At that time, the defendants were still using Kong's registered trademarks, but they have since taken down most of their websites and stopped selling the products in question.

In this case, Kong asserts the following claims:

(1) infringement of KONG trademarks and trade dress in violation of 15 U.S.C. § 1114;

(2) unfair competition in violation of 15 U.S.C. § 1125;

(3) infringement of U.S. Patent No. D817,562, alleging the defendants have manufactured, distributed, sold, offered for sale, and used the ProBall without authorization;

(4) unfair competition under Colorado common law;

(5) deceptive business practices in violation of Colo. Rev. Stat. § 6-1-105; and

(6) breach of fiduciary duty, alleging that Bounce and Mr. Markham breached their duties to Kong by allowing unauthorized use of Kong's intellectual property.

Doc. 27 at 23-29.

The defendants assert the following counterclaims against Kong:

(1) declaratory judgment, seeking a declaration that "[a]s of November 3, 2021, KONG on the one hand, and Bounce/KSP on the other hand, entered into a valid and enforceable trademark licensing agreement, the terms of which are identical to the terms of the 2019 Trademark Licensing Agreement but with KSP replacing KVP";

(2) breach of the November 3, 2021 trademark licensing agreement by Kong's filing this lawsuit instead of honoring the agreement's terms;

(3) breach of the implied duty of good faith and fair dealing with respect to the November 3, 2021 agreement; and

---

[3]    Kong apparently also filed a state-court suit on August 2, 2022, which has been consolidated with Bounce's state-court suit. Doc. 29 at 11 & n.6. As far as I am aware, the state-court case remains ongoing.

(4) promissory estoppel, in the alternative to its second and third counterclaims.

Doc. 75 at 27-34.

Kong moves for summary judgment on its trademark-infringement claim and the defendants' counterclaims. Doc. 82.

## LEGAL STANDARD

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Id.* But a movant that does not bear the ultimate burden of persuasion on a claim at trial need not disprove the claim; the movant need only identify a lack of evidence for the nonmovant on an essential element of the claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

In considering a motion for summary judgment, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145; *Scott v. Harris*, 550 U.S. 372, 378 (2007). But a nonmovant's unsupported conclusory allegations or mere traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D.

Colo. 2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). The nonmovant must offer "specific facts that would be admissible in evidence in the event of trial, from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

Kong contends that it never reached a binding trademark licensing agreement with KSP or Bounce, and that the lack of such an agreement is dispositive of liability on its trademark-infringement claim and the defendants' counterclaims. The defendants contend that numerous genuine disputes of material fact preclude judgment as a matter of law on the issue of whether a binding licensing agreement was formed on November 3, 2021. The defendants are correct.

## I. Applicable Law

A trademark licensing agreement is a contract governed by ordinary principles of state contract law. *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:43 (5th ed.). The parties agree that Colorado contract law governs this dispute. *See* Doc. 82 at 8-9 (citing Colorado case law); Doc. 93 at 15 (same); *see also* Doc. 82-2 at 6 (2019 Kong-KVP agreement "will be governed and construed in accordance with [Colorado law]"); Doc. 82-16 at 6 (2022 draft Kong-Bounce

- 14 -

agreement, "including its formation," "will be governed and construed in accordance with [Colorado law]"). The defendants bear the burden of proving a contract exists, as the existence of a license is an affirmative defense to a claim of trademark infringement, and the existence of a contract is a necessary element of their counterclaims for breach of contract and breach of the duty of good faith and fair dealing. *See Pandaw Am., Inc. v. Pandaw Cruises India Pvt. Ltd.*, 842 F. Supp. 2d 1303, 1311 (D. Colo. 2012) (license is affirmative defense to trademark infringement (citing *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 547-48 (10th Cir. 2000))); *Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024) (elements of breach of contract); *Beal Corp. Liquidating Tr. v. Valleylab, Inc.*, 927 F. Supp. 1350, 1364 (D. Colo. 1996) (valid contract must exist for implied duty of good faith and fair dealing to adhere (applying Colorado law)).

"[T]he formation of a contract requires mutual assent to the terms of the contract and legal consideration for which the parties bargained." *Univ. of Denver*, 547 P.3d at 1139; *accord I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986) (agreement is evidenced by parties' "manifestations of mutual assent"). "Mutual assent to the terms of the contract refers to 'a meeting of the minds,'" and "without a meeting of the minds, there can be no contract." *Univ. of Denver*, 547 P.3d at 1139. "If the parties fail to agree to sufficiently definite and certain terms, there is no meeting of the minds, and hence, no valid contract." *Id.*

"In order to establish the existence of a contract, the evidence must show that the parties agreed upon all essential terms." *I.M.A.*, 713 P.2d at 888. "[T]here can be no binding contract if it appears that further negotiations are required to work out important and essential terms." *Bill Barrett Corp. v. YMC Royalty Co.*, 918 F.3d 760, 768 (10th Cir. 2019)

(quoting *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo. App. 2001)). "Agreements to agree in the future are generally unenforceable." *Id.* (quoting *DiFrancesco*, 39 P.3d at 1248).

But where the parties have reached agreement on the essential terms and intend to be bound by that agreement, "the fact that they continued to negotiate over additional terms would not affect the binding nature of their previous agreement." *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 372 (Colo. App. 1994). Whether a term is "essential" to contract formation must be "determined from the intention of the parties . . . upon consideration of all surrounding facts and circumstances." *Gates Corp. v. Bando Chem. Indus., Ltd.*, 4 F. App'x 676, 684 (10th Cir. 2001) (quoting *Am. Min. Co. v. Himrod–Kimball Mines Co.*, 235 P.2d 804, 807 (Colo. 1951)). Likewise, "[w]hether or not the parties have completed their negotiations . . . is always dependent upon the circumstances of the particular case." *Id.* at 683 (quoting *Pierce v. Marland Oil Co. of Colo.*, 278 P. 804, 806 (Colo. 1929)).

"[I]f the parties agree to formalize their agreement by a writing, the determination [of] whether they became bound by their agreement before they execute such a writing is dependent upon their intent." *James H. Moore*, 892 P.2d at 372 (citing *Coulter v. Anderson*, 357 P.2d 76 (Colo. 1960)). "[A] party is not bound by an oral agreement if it does not intend to be bound until a formal document is executed." *Joseph Brazier, Ltd. v. Specialty Bar Prods. Co.*, No. 06-cv-01416-WDM-KLM, 2009 WL 690308, at *3 (D. Colo. Mar. 12, 2009) (applying Colorado law). But "an intention to reduce an agreement to a more formal writing is not of itself sufficient to show that the parties intended that until such formal writing was executed the informal contract should be without binding force." *Gates*, 4 F. App'x at 683 (cleaned up) (quoting *I.M.A.*, 713 P.2d at 888).

Where an oral agreement has not been reduced to writing, the party arguing against enforcement must show "either that both parties understood they were not to be bound until the executed contract was delivered, or that the other party should have known that the disclaiming party did not intend to be bound before the contract was signed." *Joseph Brazier*, 2009 WL 690308, at \*3. "[W]hether [the parties] designed that their agreement should be expressed in a formal written contract[] is always dependent upon the circumstances of the particular case." *Gates*, 4 F. App'x at 683 (quoting *Pierce*, 278 P.at 806).

Under Colorado law, when the existence of a contract is in issue, "evidence of the parties' conduct, their oral statements and their writings, and other evidence illuminating the circumstances surrounding the making of an agreement are admissible to clarify the intent and purpose of the parties." *I.M.A.*, 713 P.2d at 888; *accord Bill Barrett Corp.*, 918 F.3d at 767 (existence of contract may be inferred from circumstantial evidence of parties' conduct and course of performance (citing *Agritrack Inc v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1193 (Colo. 2001))). "[T]he issue of intent is one that can only rarely be resolved by means of a summary judgment." *James H. Moore*, 892 P.2d at 372. "[W]hen the existence of a contract is in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists." *I.M.A.*, 713 P.2d at 887.

## II. Analysis

Viewing the summary-judgment evidence in the light most favorable to the defendants and drawing all reasonable inferences in their favor, a reasonable juror could find that a trademark licensing agreement was formed at the November 3, 2021 meeting. Mr. Markham testified that following the meeting, "[e]verybody was in agreement with what we were doing," and "[t]here was never any ambiguity about us having a

license to move forward." Doc. 93-4 at 10. He further testified that "agree[ing] to do something and have the paperwork eventually catch up with it" was consistent with how he and Mr. Nelson had done business over the years, and "[e]verybody was in agreement. Somebody just needed to draft what we all talked about." *Id.* at 3, 10, 14. This testimony is corroborated by the email he sent immediately following the meeting asking Mr. Dallmann to draft an agreement between Kong and Bounce "the same as or close to the standard Trademark Licensing agreement that was in place with KVP," to which Mr. Nelson responded, "agree." Doc. 93-7 at 2; *see also* Doc. 93-8 at 8-9 ("Q. Was it KONG's assumption that everything had to stop completely and nothing could be done . . . until new agreements were signed? A. That was not our assumption."). This is sufficient to survive summary judgment on the issue of whether a license agreement existed.

Where, as here, "the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists." *I.M.A.*, 713 P.2d at 887. Kong's argument that the parties' discussions at the November 3 meeting at most amounted to an offer by Mr. Nelson to enter an agreement identical to the Kong-KVP agreement with KSP replacing KVP, which Mr. Markham rejected by proposing additional terms on December 14, is one view of the evidence. But viewing the evidence in the light most favorable to the defendants, a reasonable juror could conclude that an agreement was reached on November 3, and Mr. Markham's December 14 email therefore "could not have rejected an offer previously accepted." *Townsend v. Daniel, Mann, Johnson & Mendenhall*, 196 F.3d 1140, 1145 (10th Cir. 1999) (applying Colorado law and finding in circumstances similar to these that "the evidence, at the very least, presents a jury question"); *see also James H. Moore*, 892 P.2d at 372 (if parties reached binding agreement on essential terms, "the fact that they continued to negotiate over additional terms would

not affect the binding nature of their previous agreement"). And the fact that the parties may not have reached agreement on the essential terms of related contracts such as the ProBall distribution agreement does not preclude a finding that they did reach agreement on the essential terms of a trademark license. *Cf. Bill Barrett Corp.*, 918 F.3d at 768-69 (reasonable jury could conclude parties entered binding agreement to participate in ownership of oil wells, despite documents' reference to future negotiation and execution of related joint operating agreement).

There is a genuine dispute of material fact as to whether the parties reached a binding trademark licensing agreement.

## A.  Trademark Infringement

Kong's argument that it is entitled to summary judgment of liability on its trademark-infringement claim is premised entirely on the lack of a licensing agreement between it and Bounce or KSP. *See* Doc. 82 at 10 ("Defendants cannot establish their use [of Kong's registered trademarks] was authorized based on a non-existent licensing agreement. Accordingly, the only element arguably in dispute is whether KONG can establish that Defendants' use . . . was likely to cause confusion [in the marketplace]."). Because there are genuine disputes of material fact as to whether a licensing agreement was formed between the parties and what products, if any, were approved under the terms of any licensing agreement, there is likewise a genuine dispute of material fact as to whether the defendants' use of Kong's trademarks was authorized. Kong's request for summary judgment on this claim must therefore be denied.

## B.  Declaratory Judgment, Breach of Contract, and Breach of Duty of Good Faith and Fair Dealing

As to the defendants' counterclaims for declaratory judgment, breach of contract, and breach of the duty of good faith and fair dealing, Kong

argues that "even assuming KONG did enter into a new licensing agreement with Bounce/KSP on the same terms as the KONG/KVP Agreement," the defendants' claims still fail because the Kong-KVP agreement includes a merger clause requiring that any modifications or changes to it be in writing, and "there are no written documents evidencing that KONG . . . approved any Marked Products" during the term of the Kong-KVP agreement. Doc. 82 at 13-14. Kong argues that it is impermissible to allow the jury "to look outside the four corners of th[e] alleged agreement and rely on alleged oral 'discussions' and 'understandings' between the parties as to the Marked Products that are subject to the agreement." *Id.* at 14.

Kong is incorrect. For better or worse, under Colorado law, "[p]arties to an initial agreement may modify or waive it in part or in whole by subsequent words and actions." *S. Colo. MRI Ltd. v. Med-Alliance, Inc.*, 166 F.3d 1094, 1099 (10th Cir. 1999) (citing *James H. Moore*, 892 P.2d at 372). This is true "even in the face of a specific provision in the written agreement that all modifications must be in writing." *James H. Moore*, 892 P.2d at 372 (citing *Colo. Inv. Servs., Inc. v. Hager*, 685 P.2d 1371 (Colo. App. 1984)). The defendants have presented evidence from which a reasonable juror could find that during the term of the Kong-KVP agreement, Kong impliedly approved or waived its right to approve the products that KVP sold. *See, e.g.*, Doc. 93-5 at 4-5 (KVP representative testified that for approximately two years, KVP marketed and sold "the 12-inch KONG [and] the 12-inch KONG with a Ring" in two colors "[a]nd we sold the Ring by itself," and during that time Kong reviewed marketing materials and product packaging, accepted royalty payments, and never told KVP it was not authorized to sell those products); Doc. 93-8 at 6-7 (Mr. Nelson testified that when KVP transferred its websites to KSP, Kong did not ask that any products shown on the websites be removed); *see also James H. Moore*, 892 P.2d at 372 (modification or

waiver of contractual provisions through course of conduct "is a question of fact [that] is . . . not normally appropriate for summary judgment").

There are genuine disputes of material fact as to what products, if any, Kong approved during the term of the Kong-KVP licensing agreement and whether Kong and Bounce or KSP formed a licensing agreement with the same terms. Kong's request for summary judgment must therefore be denied as to the defendants' counterclaims for declaratory judgment that such an agreement was formed and for breach of that agreement and the associated duty of good faith and fair dealing.

## C. Promissory Estoppel

The defendants' counterclaim for promissory estoppel does not depend on the existence of a contract between the parties and is asserted in the alternative to their claims for breach of contract and breach of the duty of good faith and fair dealing. Doc. 75 at 33-34. Promissory estoppel provides a remedy for those who rely to their detriment on the promise of another, despite the absence of any mutual agreement by the parties on all the essential terms of a contract. *Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007). "The doctrine of promissory estoppel encourages fair dealing in business relationships and discourages conduct which unreasonably causes foreseeable economic loss because of action or inaction induced by a specific promise." *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo. 1983). The elements of a claim for promissory estoppel are: (1) the promisor made a promise to the promisee; (2) the promisor should have reasonably expected that the promise would induce action or forbearance by the promisee; (3) the promisee reasonably relied on the promise to his or her detriment; and (4) the promise must be enforced to prevent injustice. *Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 151 (Colo. 2006).

The defendants have presented evidence sufficient to demonstrate a genuine dispute of material fact as to whether: (1) Kong promised to continue its business venture with Bounce and KSP in the same manner as its arrangement with Bounce and KVP under the Triangle Agreements, and more specifically, promised to license its trademarks for Bounce's and KSP's use with respect to certain products; (2) Kong should have reasonably expected that the defendants would rely on that promise; (3) the defendants reasonably relied on that promise to their detriment, namely by continuing to manufacture and sell products using Kong's trademarks, actions that they have now expended resources defending in this lawsuit; and (4) Kong's promise must be enforced to prevent injustice.

Kong argues that the alleged promise is too "amorphous" to be enforced. But just as a reasonable juror could find the parties reached a meeting of the minds on terms sufficiently specific to create a valid contract, so too could a reasonable juror find that Kong made a promise sufficiently specific to support a claim of promissory estoppel. *See Walker v. Life Care Ctrs. of Am., Inc.*, No. 04-CV-02418-LTB-CBS, 2006 WL 1537194, at *6 (D. Colo. June 2, 2006) (same evidence that demonstrated fact issue as to whether contract existed was sufficient to demonstrate fact issue as to promissory estoppel (applying Colorado law)). Kong also argues that any reliance on its alleged promise was unreasonable after Kong sent its February 3, 2022 cease-and-desist letter. But reasonableness is typically a fact question for the jury, and at a minimum, a jury could find that the defendants' reliance was reasonable during the period between November 3, 2021 and February 3, 2022.

Kong's request for summary judgment on the defendants' promissory estoppel counterclaim must be denied.

## CONCLUSION

It is **ORDERED** that Plaintiff's Motion for Partial Summary Judgment on Claim One and Counterclaims, **Doc. 82**, is **DENIED**.

DATED: March 27, 2025        BY THE COURT:

Daniel D. Domenico
United States District Judge