IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:22-cv-02001-DDD-SBP

THE KONG COMPANY, LLC,

     Plaintiff,

v.

BOUNCE ENTERPRISES, LLC;
KSP USA, LLC; and
JOSEPH MARKHAM,

     Defendants.

---

**ORDER
GRANTING IN PART PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON ASSIGNOR ESTOPPEL,
DENYING DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT, AND
GRANTING IN PART DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY OF JOHN NELSON**

---

Plaintiff The Kong Company, LLC has filed suit against Defendants Bounce Enterprises, LLC; KSP USA, LLC; and Joseph Markham alleging, among other things, infringement of U.S. Patent No. D817,562. The defendants contend that the D'562 patent is invalid as anticipated and obvious. Kong contends that the defendants are estopped from asserting any invalidity defense under the doctrine of assignor estoppel. The parties have filed cross-motions for summary judgment on invalidity. Docs. 83, 87. The defendants also seek summary judgment on Kong's state-law claims alleging deceptive business practices and breach of fiduciary duty, Doc. 87, and move to exclude the non-retained expert testimony of one of Kong's managers, John Nelson, Doc. 89. For the following reasons, (1) the plaintiff's motion for partial summary judgment on

assignor estoppel is granted in part as to all invalidity defenses except obviousness; (2) the defendants' motion for partial summary judgment on invalidity, deceptive business practices, and breach of fiduciary duty is denied; and (3) the defendants' motion to exclude Mr. Nelson's testimony is granted in part.

## RELEVANT FACTS[1]

### I.   Background

Kong designs, manufactures, and sells pet products throughout the United States. Bounce is a holding company that holds equity interests in both Kong and KSP. Doc. 93-2 at 3. Mr. Markham is one of the founders of Kong and the inventor of the popular snowman-shaped "KONG" dog toy. Doc. 75 at 18; Doc. 76 at 1. It appears that Mr. Markham is a 50% owner of Kong, either directly or via his ownership of Bounce, though the record is not entirely clear on that point. *See* Doc. 27 at 2; Doc. 75 at 2, 4, 18; Doc. 76 at 1-2. Mr. Markham has been one of Kong's managers since 2005. Doc. 87 at 5; Doc. 92 at 2 Doc. 75 at 20; Doc. 76 at 4. Kong is also managed by John Nelson. Doc. 75 at 20; Doc. 76 at 4. Kong owns numerous registered KONG trademarks.

In July 2019, Kong, Bounce, and an entity called KVP International, Inc. entered into a set of agreements the parties call "the Triangle Agreements." Mr. Nelson is the president of KVP, and he, Mr. Markham, and Kong's president, Kathy Decker ("KD") Frueh, all own shares of KVP. Pursuant to the Triangle Agreements, Bounce would develop

---

[1]   The following facts are undisputed unless otherwise noted. Absent citation to another part of the record, these facts are drawn from the parties' statements of material fact. *See* Doc. 83 at 2-3; Doc. 91 at 2-6; Doc. 98 at 1-2; Doc. 87 at 5-17; Doc. 92 at 2-13; Doc. 99 at 4-7. In this Order, all pinpoint citations to the record use the blue page number appended by the Court's Electronic Case Filing system at the top of each page, which may differ from a document's internal pagination.

and manufacture products for zoo and other non-domesticated animals, and KVP would have the exclusive right to market and sell those products. One of the Triangle Agreements was a trademark licensing agreement between Kong and KVP.

Disputes arose between Kong, Bounce, and KVP concerning the Triangle Agreements, and the agreements were terminated in late 2021. The parties dispute whether Kong then entered into a new trademark licensing agreement with Bounce or KSP, and that dispute is the subject of a separate summary-judgment order. Doc. 112. After the termination of the Triangle Agreements, KVP transferred its websites and social-media accounts relating to the sale of Bounce's products over to the defendants, and the defendants continued to use those websites and social-media accounts to market and sell various products using KONG trademarks. By at least January 2022, Bounce and KSP were manufacturing and selling a pet toy called the ProBall.

In early 2022, numerous disputes arose between the parties concerning the corporate governance of Kong and related entities, a real-estate sale, and payments between Kong and Mr. Markham. *See* Doc. 112 at 9-13 & n.3. Ultimately, Bounce filed a lawsuit in state court against Kong, Mr. Nelson, Ms. Frueh, and others on August 2, 2022, Doc. 29-3, and Kong filed this suit in federal court on August 9, 2022, Doc. 1.[2]

In this suit, Kong asserts the following claims:

(1) infringement of KONG trademarks and trade dress in violation of 15 U.S.C. § 1114;

(2) unfair competition in violation of 15 U.S.C. § 1125;

---

[2] Kong apparently also filed a state-court suit on August 2, 2022, which has been consolidated with Bounce's state-court suit. Doc. 29 at 11 & n.6. As far as I am aware, the state-court case remains ongoing.

(3) infringement of the D'562 Patent, alleging the defendants have manufactured, distributed, sold, offered for sale, and used the ProBall without authorization;

(4) unfair competition under Colorado common law;

(5) deceptive business practices in violation of Colo. Rev. Stat. § 6-1-105; and

(6) breach of fiduciary duty, alleging that Bounce and Mr. Markham breached their duties to Kong by allowing unauthorized use of Kong's intellectual property.

Doc. 27 at 23-29. The defendants assert several affirmative defenses, one of which is invalidity of the D'562 Patent.

## II.  D'562 Patent

The D'562 Patent was filed on November 30, 2016 as Application No. 29/586,034. D'562 Patent, at [21], [22]. The application contained one claim for "[t]he ornamental design for a Pet Toy with a Multifaceted Surface as shown and described" in five figures. Doc. 59-1 at 2-7. Mr. Markham is the named inventor. D'562 Patent, at [72]. On January 14, 2017, Mr. Markham assigned the pending '034 Application to Kong for "consideration of One Dollar ($1.00) . . . and other good and valuable consideration, the receipt and sufficiency of which I acknowledge." Doc. 83-7 at 2-3. In connection with the assignment, Mr. Markham agreed to "do all lawful acts that may be necessary or desirable to assist [Kong] . . . to obtain and enforce patent protection for the invention in the United States." *Id.* at 3.

On January 18, 2017, the attorney prosecuting the patent application submitted an Information Disclosure Statement to the patent examiner identifying a number of references that may be relevant to patentability, one of which was a non-patent reference called "Gough-Nuts." Doc. 83-6. On January 17, 2018, the patent examiner issued a Notice of Allowance. Doc. 53-2. In conjunction with the Notice of

Allowance, the examiner made an amendment that changed the title of the patent from "Pet Toy with a Multifaceted Surface" to "Pet Toy." Doc. 53-2 at 7. Neither party has argued that this examiner's amendment had any effect on the scope of the claimed design. The examiner did not issue any rejection or other office action prior to the Notice of Allowance. No claims were added during prosecution, and no amendments were made to the figures that show the claimed design.

The '034 Application issued as the D'562 Patent on May 8, 2018. D'562 Patent, at [45]. I have construed the D'562 Patent to "encompass[] the depicted ornamental aspects of a ball-shaped pet toy having interconnected channels that form raised quadrants on the surface," with clarifications that "the cylindrical opening through the core of the ball is not part of the claimed design," "the lines depicted within the interconnected channels are in the nature of contour lines," and "the scope of the claimed design is limited to the overall ornamental visual impression of the depicted ball and does not include the broader general design concept of any ball with interconnected channels." Doc. 69 at 13.

The defendants contend that the D'562 Patent is invalid as anticipated and obvious in view of the Goughnuts ball. Doc. 87. Representative views of the claimed design and the Goughnuts ball are below:



D'562 Patent figs. 1, 2; Doc. 87 at 22.

### III. Kong's Damages Disclosures

In response to the defendants' interrogatory asking Kong to "state all of your theories concerning damages," Kong responded that:

> [Kong] cannot provide a response to this Interrogatory, beyond what is provided in its Initial Disclosures, without further discovery, including but not limited to, receiving Defendants' responses to Plaintiff's First Set of Written Discovery to the Defendants. Additionally, detailed information regarding KONG's damages will likely be the subject of expert opinion testimony.

Doc. 87-13 at 12-13.

Kong timely designated Mr. Nelson as a non-retained expert witness to testify regarding:

> (1) pet-toy products and consumer behaviors relating to the purchase of pet-toy products[,] and (2) marketing and brand value relating to pet-toy related brands and products. Specifically, Mr. Nelson will testify regarding the types of pet-toy ball products that existed in the marketplace as of November 30, 2016, as well as the general knowledge and factors considered by ordinary consumers of pet-toy products. Mr. Nelson will further testify regarding the harm caused to the value of KONG's brand and goodwill as a result of the use of KONG's trademarks in a manner inconsistent with KONG's style and use guidelines and in connection with products outside of KONG's product catalogue.

Doc. 87-6 at 1-2. Kong's expert disclosure further specified that "Mr. Nelson will testify regarding how Defendants' use [of Kong's trademarks], and the harm caused thereby, resulted in monetary damages to KONG of at least $2,000,000." *Id.* at 2-3.

The same day it disclosed Mr. Nelson as a non-retained expert witness, Kong supplemented its initial disclosures to state that it seeks the following damages:

(1) Disgorgement damages of approximately $2,756 for the defendants' design patent infringement, plus an award of treble damages based on willful conduct pursuant to 35 U.S.C. § 284 and attorney fees pursuant to 35 U.S.C. § 285;

(2) Disgorgement damages of approximately $79,323 for the defendants' trademark infringement, unfair competition, and/or breaches of fiduciary duty, plus an award of treble damages and attorney fees pursuant to 17 U.S.C. § 1117(b);

(3) Compensatory damages in the amount of $2,000,000 for the damages to Kong's trademarks, brand, and goodwill caused by the defendants' trademark infringement, unfair competition, and breaches of fiduciary duty; and

(4) Prejudgment interest, attorney fees, and costs as otherwise permitted by law.

Doc. 87-21 at 5. According to Kong, it calculated the $79,323 in disgorgement damages for the defendants' use of its trademarks by adding together the "Sales Retail" and "Sales of Product Income" line items from the profit and loss statements produced by KSP, based on Bounce's deposition testimony that those numbers represented its gross receipts from sales of the accused products (although its disclosures contain a typo, as the actual sum of those line items is $79,326). *See* Doc. 92-9 at 3-7; Doc. 92 at 10-11.

Kong moves for summary judgment that the defendants are estopped from asserting any invalidity defense. Doc. 83. The defendants move for summary judgment of invalidity in view of the Goughnuts ball, and for summary judgment on Kong's claims for deceptive business practices under Colo. Rev. Stat. § 6-1-105 and breach of fiduciary duty, arguing that Kong has failed to establish it suffered any recoverable damages. Doc. 87. The defendants also move to exclude the non-retained expert testimony of Mr. Nelson. Doc. 89.

## SUMMARY-JUDGMENT STANDARD

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Id.* But a movant that does not bear the ultimate burden of persuasion on a claim at trial need not disprove the claim; the movant need only identify a lack of evidence for the nonmovant on an essential element of the claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

In considering a motion for summary judgment, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145; *Scott v. Harris*, 550 U.S. 372, 378 (2007). But a nonmovant's unsupported conclusory allegations or mere traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). The nonmovant must offer "specific facts that would be admissible in evidence in the event of trial, from

which a rational trier of fact could find for the nonmovant." *Adler*, 144
F.3d at 671. "If a party fails to properly support an assertion of fact or
fails to properly address another party's assertion of fact . . . the court
may . . . consider the fact undisputed for purposes of the motion." Fed.
R. Civ. P. 56(e)(2). If a reasonable juror could not return a verdict for the
nonmoving party, summary judgment is proper, and there is no need for
a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

### I.  Assignor Estoppel

#### A.  Applicable Law

The doctrine of assignor estoppel applies "when an inventor says one
thing (explicitly or implicitly) in assigning a patent and the opposite in
litigating against the patent's owner." *Minerva Surgical, Inc. v. Hologic,
Inc.*, 594 U.S. 559, 566 (2021).

> Courts have long applied the doctrine of assignor estoppel
> to deal with inconsistent representations about a patent's
> validity. The classic case . . . begins with an inventor who
> both applies for and obtains a patent, then assigns it to a
> company for value. Later, the inventor/assignor joins a
> competitor business, where he develops a similar—and
> possibly infringing—product. When the assignee company
> sues for infringement, the assignor tries to argue—con-
> trary to the (explicit or implicit) assurance given in assign-
> ing the patent—that the invention was never patentable,
> so the patent was never valid.

*Id.* at 566-67. The assignor's explicit or implicit representation that the
patent he is assigning is not worthless deprives him of the ability to later
challenge the patent's validity. *Id.* at 567. "As to the rest of the world,
the patent may have no efficacy . . . but the assignor cannot be heard to
question the right of his assignee to exclude him from its use." *Westing-
house Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349
(1924).

The doctrine of assignor estoppel is grounded in the principle of fairness. *Minerva Surgical*, 594 U.S. at 568, 571. "[T]he assignor has made an explicit or implicit representation about the patent's validity, and received some kind of payment in return." *Id.* at 573. It is unfair for an inventor to "first sell[] a patent and then contend[] that the thing sold is worthless." *Id.* at 574. "Assignor estoppel, like many estoppel rules, reflects a demand for consistency in dealing with others." *Id.* at 575.

> When a person sells his patent rights, he makes an (at least) implicit representation to the buyer that the patent at issue is valid—that it will actually give the buyer his sought-for monopoly. In later raising an invalidity defense, the assignor disavows that implied warranty. And he does so in service of regaining access to the invention he has just sold. . . . [T]he assignor wants to make a "representation at the time of assignment (to his advantage) and later to repudiate it (again to his advantage). By saying one thing and then saying another, the assignor wants to profit doubly—by gaining both the price of assigning the patent and the continued right to use the invention it covers."

*Id.* (citation omitted) (quoting *Diamond Sci. Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988)).[3]

Assignor estoppel does not apply when the underlying principle of fair dealing does not come into play. *Id.* at 576. "What creates the unfairness is contradiction." *Id.* "[W]hen the assignor has made neither explicit nor implicit representations in conflict with an invalidity defense, then there is no unfairness in its assertion," and "no ground for applying assignor estoppel." *Id.* The Supreme Court has identified examples of scenarios where an assignor's later challenge to a patent's validity would not unfairly contradict the prior representation of validity made in

---

[3] Federal Circuit law governs "substantive and procedural issues unique to and intimately involved in federal patent law," while regional circuit law governs other issues. *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 830 F.3d 1335, 1338 (Fed. Cir. 2016).

connection with the assignment. The defendants argue that two of those scenarios apply in this case. First, estoppel may not apply when an inventor assigns a patent application rather than an issued patent and the assignee then returns to the patent office to enlarge the patent's claims. *Id.* at 570, 577 (citing *Westinghouse*, 266 U.S. at 353). If "the new claims are materially broader than the old claims, the assignor did not warrant the new claims' validity," and the assignor can challenge the new claims in later litigation. *Id.* at 577. Second, a later legal development may render irrelevant the warrant of validity given at the time of the assignment. *Id.* If "the governing law . . . changes, so that previously valid patents become invalid," "[t]he inventor may claim that the patent is invalid in light of that change in law without contradicting his earlier representation." *Id.*

**B.  Analysis**

Assignor estoppel applies to all of the defendants' invalidity defenses except obviousness. In presenting the '034 Application to the patent office, Mr. Markham signed an oath stating his implicit good-faith belief that the claim in the application was patentable and would result in a valid patent, and he implicitly reaffirmed that representation to Kong when he assigned the pending application. *Minerva Surgical*, 594 U.S. at 575 & n.3. The defendants[4] therefore may not now argue contrary to Mr. Markham's representation that the claimed design was patentable based on the governing law at the time. But as to obviousness, there has been a recent legal development such that the claimed design may be

---

[4]    Assignor estoppel applies both to the assignor and those in privity with him. *MAG Aerospace Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1379-80 (Fed. Cir. 2016). The defendants do not argue that Bounce and KSP are not in privity with Mr. Markham for purposes of application of the doctrine.

invalid when it was not before, so the defendants are not estopped from asserting an obviousness defense.

### 1. Kong did not enlarge the scope of the claimed design after the patent application was assigned.

The defendants argue that they are not estopped from asserting any of their invalidity defenses because, by arguing in this case that the claimed design includes the interconnected channels depicted on the ball, Kong has expanded the scope of the invention that Mr. Markham believed he was assigning, thus implicating one of the exceptions to assignor estoppel the Supreme Court discussed in *Minerva Surgical*. Doc. 91 at 7-8. According to the defendants, Mr. Markham believed the design he assigned encompassed only the shape and depth of the channels, but not the channels themselves. *Id.* As noted above, I have construed the claimed design to exclude the "general design concept of any ball with interconnected channels," but to include the ornamental features of the channels depicted in the patents' figures, including their configuration to form quadrants on each hemisphere, their U-like appearance in cross section, and their curvature at the corners of the quadrants. Doc. 69 at 10-13.

The defendants are incorrect that by arguing for a particular claim construction in this case, Kong has enlarged the claim scope beyond what Mr. Markham assigned. The exception to assignor estoppel the defendants assert applies when the assignee returns to the patent office to enlarge the scope of the assigned application's claims and the issued claims are materially broader than those that were assigned. *Minerva Surgical*, 594 U.S. at 577. That did not happen here. Kong did not return to the patent office to make any changes to the pending application after it was assigned, either by amendment or by making arguments or representations to the patent examiner that are documented in the patent's

prosecution history.[5] To assess the applicability of this exception, a court must "construe the assigned and issued claims and compare the properly construed claims" to determine if the issued claims are materially broader than those assigned. *Hologic, Inc. v. Minerva Surgical, Inc.*, 44 F.4th 1358, 1365 (Fed. Cir. 2022). But here the issued claim is identical to the one that was assigned, so the exception does not apply.

That the proper claim construction may be broader than what Mr. Markham subjectively believed he assigned is of no import. Claim scope is determined based "not [on] the subjective intent of the inventor or others, but rather [on] the objective test of what one of ordinary skill in the art at the time of the invention would have understood the [claim] to mean." *Intell. Prop. Dev. v. UA Columbia Cablevision of Westchester, Inc.*, No. 94 CIV. 6296(SS), 1998 WL 142346, at *21 (S.D.N.Y. Mar. 26, 1998) (Sotomayor, J.) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995)). "Except as documented in the prosecution history, the subjective intent of the inventor . . . is of no probative weight in determining the scope of the claims." *Id.* (citing *Markman*, 52 F.3d at 985; *N. Am. Vaccine Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1578 (Fed. Cir. 1993)). Here the claim's scope did not change post-assignment. Assignor estoppel does not bar the defendants from making arguments in favor of a narrower claim construction, and they did so at the claim-construction stage. *See Minerva Surgical*, 594 U.S. at 569-70 (citing *Westinghouse*, 266 U.S. at 350-51). But it does estop them from asserting that the patent is invalid, with the exception discussed below.

---

[5] As noted above, the defendants have not argued that the examiner's amendment to the title of the design had any effect on claim scope.

### 2. There has been a material change in the governing law on obviousness.

The defendants are correct that the recent change in the law governing obviousness of design patents implicates an exception to assignor estoppel. *See* Doc. 91 at 9. In May 2024, the Federal Circuit issued a decision overruling its previous test for obviousness of design patents. *LKQ Corp. v. GM Global Tech. Operations LLC*, 102 F.4th 1280 (Fed. Cir. 2024) (en banc). Specifically, the court overruled the "requirements that the primary reference must be 'basically the same' as the challenged design claim and that any secondary references must be 'so related' to the primary reference that features in one would suggest application of those features to the other." *Id.* at 1287. The court adopted a "more flexible approach . . . for determining []obviousness." *Id.*

Prior to *LKQ*, a two-step test governed the assessment of obviousness or nonobviousness of a design patent. *LKQ*, 102 F.4th at 1289, 1293. In the first step, the party challenging validity had to identify a single prior-art reference that was "basically the same" as the claimed design. *Id.* A design patent could not be invalidated on obviousness grounds without such a reference. *Id.* at 1289, 1294. If such a primary reference was identified, in the second step, the factfinder could consider features missing in the primary reference but shown in a secondary reference only if the secondary reference was "so related" to the primary reference "that features in one would suggest application of those features to the other." *Id.* at 1293. In *LKQ*, the Federal Circuit held that test to be "improperly rigid" and not in alignment with the text of the obviousness statute, 35 U.S.C. § 103, and Supreme Court precedents applying it. *Id.* at 1291-95. The court stated that the "obviousness language [in Section 103] sets forth an expansive and flexible approach for assessing obviousness." *Id.* at 1294.

- 14 -

The Federal Circuit announced a new four-factor framework for assessing the obviousness or nonobviousness of a design patent. *Id.* at 1295-1300. The ultimate question of obviousness is one of law based on underlying factual inquiries. *Id.* at 1291. First, the factfinder should consider the scope and content of analogous prior art within the knowledge of an ordinary designer in the field of the design. *Id.* at 1295-96. The party challenging validity still must identify a primary prior-art reference, but there is no threshold similarity or "basically the same" requirement to qualify as analogous prior art. *Id.* at 1296-98. Whether a prior art design is analogous to the claimed design is a fact question to be addressed on a case-by-case basis. *Id.* at 1297. Second, the factfinder should determine the differences in visual appearance between the prior art and the design claim at issue from the perspective of an ordinary designer in the field. *Id.* at 1298. Third, the level of ordinary skill in the pertinent art must be resolved. *Id.* at 1298-99.

And fourth, "[a]fter ascertaining the knowledge of an ordinary designer in the relevant field, the scope and content of the prior art, and the differences between the prior art and the claimed design, the obviousness or nonobviousness of the claimed design is evaluated." *Id.* at 1299. An obvious modification to a single primary reference may invalidate a patent, even without any secondary references. *See Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 & n.5 (Fed. Cir. 2009). Where the primary reference alone does not render the claimed design obvious, secondary references may be considered. *LKQ*, 102 F.4th at 1299. The secondary references must be analogous prior art to the patented design, but they need not be "so related" to the primary reference that features in one would suggest application of those features in the other. *Id.* To support a finding of obviousness, there must be some reason an ordinary designer in the field would have been

motivated to modify the prior art "to create the same overall appearance as the claimed design." *Id.* at 1299-1300. At the fourth step, any secondary indicia of nonobviousness—*e.g.*, commercial success, industry praise, or copying of the claimed design—must also be considered. *Id.* at 1300.

Kong argues that the differences between the prior obviousness test and the one announced in *LKQ* are immaterial for purposes of this case and do not implicate the relevant exception to assignor estoppel. Doc. 92 at 16-17. I disagree. For one thing, Kong previously argued that the Goughnuts ball is "not substantially the same as the claimed design" under the prior test, Doc. 87-19 at 2, 4, while it now concedes that the Goughnuts ball is an analogous prior art reference under *LKQ*, Doc. 92 at 17. Kong points out that under both the prior and current tests, the defendants must demonstrate that an ordinary designer in the field would have been motivated to modify the prior art to create the same overall visual appearance as the claimed design. *Id.* at 17 (citing *LKQ*, 102 F.4th at 1299). That's true, but Kong ignores the fact that in *LKQ*, the court relaxed that requirement. When considering multiple prior-art references, the necessary motivation need not "come from the references themselves"; a defendant now need only establish "some record-supported reason" that would have motivated an ordinary designer to modify the prior art to create the claimed design. 102 F.4th at 1299.

The defendants contend that the D'562 Patent is obvious in view of the Goughnuts ball, either alone or in combination with U.S. Design Patent No. D545,509.[6] *See* Doc. 87 at 23-24; Doc. 80. In light of the new,

---

[6] The defendants move for summary judgment of obviousness only in view of the Goughnuts ball. Doc. 87. But they may still intend to assert at trial that the D'562 Patent is obvious in view of the Goughnuts ball combined with the D'509 Patent.

more "expansive and flexible" approach to assessing obviousness announced in *LKQ*, 102 F.4th at 1294-1300, it is now possible that "what was valid before is invalid today," *Minerva Surgical*, 594 U.S. at 576. The defendants may therefore claim that the D'562 Patent is invalid as obvious in light of the change in the law without contradicting Mr. Markham's earlier representation that the claimed design was valid at the time of the assignment. *Id.*

Kong's motion for partial summary judgment on assignor estoppel is therefore granted only in part. Because of the change in the governing law on obviousness, the defendants are not estopped from asserting an obviousness defense. They are, however, estopped from asserting other grounds for invalidity, *i.e.*, anticipation and indefiniteness.

## II.  Validity of the D'562 Patent

The defendants request summary judgment that the D'562 Patent is invalid as anticipated and obvious in view of the Goughnuts ball. Their request is denied as to anticipation on the basis of assignor estoppel as just noted. As to obviousness, the defendants bear the burden to establish invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). And as discussed above, the ultimate question of obviousness is a matter of law based on underlying factual inquiries. *LKQ*, 102 F.4th at 1291, 1295-1300. In this case, genuine disputes of material fact on at least the fourth factual inquiry preclude summary judgment of obviousness.

As to the first *LKQ* factor, Kong does not dispute that the Goughnuts ball is an analogous prior-art reference. As to the second factor, while there can be no genuine dispute that the designs have similarities, there also can be no genuine dispute that there are differences in visual appearance between the Goughnuts ball and the design claimed in the D'562 Patent. For instance, though the Goughnuts ball has

interconnecting channels configured to form four quadrants on each hemisphere like in the claimed design, the corners of the quadrants on the Goughnuts ball are not curved like in the claimed design, and the channels on the Goughnuts ball are narrower and have a different cross-sectional shape than that of the channels in the claimed design. *See* Doc. 87 at 22. As to the third factor, the defendants assert that both Mr. Markham and the inventor of the Goughnuts ball are "pet toy designers of ordinary capability in the field," *id.* at 23, and Kong does not dispute that, *see* Doc. 92 at 17-18.

As to the fourth and final factor, the defendants assert that "[i]t would have been obvious for an ordinary designer in the field of pet toy balls to modify the Goughnuts Ball with the . . . channels and rounded edges of the patented design," noting that both Mr. Markham and the inventor of the Goughnuts ball independently developed balls with a similar design. Doc. 87 at 24; Doc. 99 at 9. The defendants also note, though, that a large part of both inventors' motivation in designing the interconnected channels was functional—to provide airflow and prevent dogs from choking on the balls. *See* Doc. 87 at 24; Doc. 99 at 9 ("Mr. Markham refined the design . . . enhancing the effectiveness of the safety features . . . ."); Doc. 83-3 at 15-17 (Markham testimony that he considered depth of channels in his design to be functional improvement over Goughnuts ball, while more rounded corners of quadrants and U-shape of channels were aesthetic features). The defendants have not presented clear and convincing evidence from which any reasonable juror would be compelled to find that an ordinary designer in the field would have been motivated to modify the *ornamental* aspects of the interconnected channels on the Goughnuts ball to create the same overall visual appearance as the claimed design. *See LKQ*, 102 F.4th at 1292-93, 1299-1300 (noting that in *Smith v. Whitman Saddle Co.*, 148 U.S. 674, 681-82 (1893), the Supreme Court "withheld judgment on the validity of

the overall design" "without evidence that [the claimed design's modification to prior art designs] was known in the prior art or similar to the existing prior art references"); *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 680 (Fed. Cir. 2008) (design includes only ornamental features not dictated by function); *see also* Doc. 69 at 10-13. And as Kong points out, the Goughnuts ball was disclosed to the patent examiner. Doc. 83-6; D'562 Patent, at [56]. Though that does not raise the defendants' burden of proof, it does mean that a reasonable juror may assign less weight to that reference. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260-61 (Fed. Cir. 2012) ("[I]t may be harder to meet the clear and convincing burden when the invalidity contention is based upon . . . [a] reference that the PTO already considered."). The weight of the evidence is an issue for the jury. *See id.* (parties are "free to, and generally do, make these arguments to the fact finder").

Viewing the evidence in the light most favorable to Kong and drawing all reasonable inferences in its favor, and considering that the defendants bear the burden of proving obviousness by clear and convincing evidence, a reasonable juror could find it was nonobvious for an ordinary designer in the field to modify the Goughnuts ball to create the same overall appearance as the design claimed in the D'562 Patent. The defendants' request for summary judgment of obviousness is therefore denied.

### III. Deceptive Business Practices and Breach of Fiduciary Duty

#### A. Applicable Law

##### 1. Deceptive Business Practices

A defendant engages in an unfair or deceptive trade practice under the Colorado Consumer Protection Act when it, among other things,

> (a) Either knowingly or recklessly passes off goods, services, or property as those of another;

- 19 -

(b) Either knowingly or recklessly makes a false represen-
tation as to the source, sponsorship, approval, or certifica-
tion of goods, services, or property; [or]

(c) Either knowingly or recklessly makes a false represen-
tation as to affiliation, connection, or association with or
certification by another.

Colo. Rev. Stat. § 6-1-105(1)(a)-(c). The elements of a private cause of
action under the Act are as follows: (1) the defendant engaged in an un-
fair or deceptive trade practice; (2) the challenged practice occurred in
the course of defendant's business, vocation, or occupation; (3) it signifi-
cantly impacts the public as actual or potential consumers of the defend-
ant's goods, services, or property; (4) the plaintiff suffered the injury in
fact to a legally protected interest; and (5) the challenged practice
caused the plaintiff's injury. *Rhino Linings USA, Inc. v. Rocky Mountain
Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003); *see also* Colo. Rev.
Stat. § 6-1-113.

### 2. Breach of Fiduciary Duty

To establish a breach of fiduciary duty under Colorado law, a plaintiff
must prove (1) the defendant was acting as a fiduciary of the plaintiff;
(2) the defendant breached a fiduciary duty to the plaintiff; (3) the plain-
tiff incurred damages; and (4) the defendant's breach of fiduciary duty
was a cause of the plaintiff's damages. *In re Estate of Chavez*, 520
P.3d 194, 203 (Colo. App. 2022).

### B. Analysis

The defendants argue that summary judgment should be granted on
Kong's claims for deceptive business practices and breach of fiduciary
duty because Kong has presented insufficient evidence of its damages.
Doc. 87 at 25-27; Doc. 99 at 12-14. The defendants are incorrect. The de-
fendants focus their arguments on whether Kong has adduced evidence
of "measurable" or "quantifiable" damages, but as Kong points out, it

need only demonstrate the existence of some injury due to the defendants' deceptive trade practices and some economic harm due to the defendants' breaches of fiduciary duty to survive summary judgment on these claims, even if the amount of damages is uncertain. *See Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, No. 09-cv-00970-PAB-KMT, 2014 WL 103660, at *2 (D. Colo. Jan. 10, 2014) ("The CCPA provides for recovery of statutory damages [for deceptive trade practices] to recompense the invasion of a legally protected interest even where actual damages are minimal or nonexistent." (citing Colo Rev. Stat. § 6-1-113(2) (prevailing plaintiff may recover actual damages or $500))); *Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, No. 10-cv-02349-WJM-KMT, 2014 WL 811566, at *4 to *5 (D. Colo. Mar. 3, 2014) (plaintiff may recover nominal damages for breach of fiduciary duty if it establishes existence of economic harm but amount of damages is uncertain or incalculable (citing *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1024 (Colo. App. 1993))).

Kong states that it intends to offer testimony from multiple witnesses regarding its branding guidelines and how non-conforming use of its trademarks damages the company. Doc. 95 at 6; *see* Doc. 95-1 at 5-13, 14-17, 18-19 (Ms. Frueh testimony regarding Kong's policies governing how distributors and retailers use its trademarks and display its products in stores, reasons behind those policies, and effects on Kong's reputation and customer goodwill if policies are not followed); Doc. 89-2 at 8 (Mr. Nelson testimony that "If you hurt the brand, you hurt the company."). This is sufficient to survive summary judgment as to the existence of some injury and economic harm.

And, at least as to the fiduciary-duty claim, disgorgement is a recognized measure of damages, and Kong has presented evidence of quantifiable damages in this regard. *See* Colo. Pattern Civ. Jury Instr. No. 26:5

(2025), https://www.coloradojudicial.gov/media/16692 ("Anything of value or any profit the defendant . . . received as a result of the breach of fiduciary duty"). Kong asserts that the defendants profited $79,326 by selling products using Kong's trademarks, based on profit and loss statements produced by KSP and the testimony of a Bounce representative. *See* Doc. 92-9 at 3-7; Doc. 92 at 10-11. Though the defendants intend to offer contrary expert testimony that they did not realize any profit from those sales, *see* Doc. 86, I must view the evidence in the light most favorable to Kong at the summary-judgment stage.

The defendants correctly point out that Kong's disclosures do not expressly state an amount of damages sought for deceptive trade practices. *See* Doc. 87-21 at 5-6. But it is clear that the gravamen of this claim rests on the same conduct as Kong's other claims, *i.e.*, the defendants' alleged unauthorized use of Kongs trademarks. *See* Colo. Rev. Stat. § 6-1-105(1)(a)-(c) (identified deceptive trade practices include passing off goods as those of another and making a false representation as to the source of goods). Though a double recovery of the same actual damages is not permitted, Kong may bring a claim for deceptive trade practices along with other causes of action based on the same conduct. *See Lexton-Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 823 (Colo. 1992). Kong's disclosures identify a measure of damages for the conduct at issue, *i.e.*, harm to Kong's brand and goodwill. Doc. 87-21 at 5-6. The fact that the disclosures appear to have inadvertently omitted reference to Kong's claim for deceptive business practices is therefore harmless, *see* Fed. R. Civ. P. 37(c)(1), and I will not grant summary judgment on that claim on that basis.

Viewing the summary judgment evidence in the light most favorable to Kong and drawing all reasonable inferences in its favor, a reasonable juror could find that Kong suffered some injury due to the defendants'

alleged deceptive trade practices and some economic harm due to the defendants' alleged breaches of fiduciary duty. The defendants' request for summary judgment on those claims is therefore denied.

## IV. Mr. Nelson's Testimony

### A. Applicable Law

The Federal Rules of Evidence permit opinion testimony by a qualified expert if the proponent demonstrates it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

When a party challenges the admissibility of an expert opinion, the trial court must act as a gatekeeper to ensure that any expert opinion admitted is not only relevant, but also reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-52 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-89 (1993). To fulfill that gatekeeping function, courts conduct a two-step inquiry. First, the court must determine whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render the opinion. Fed. R. Evid. 702; *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022). If the expert is qualified, the court must then determine whether the proffered opinion is reliable under the principles set forth in *Daubert* and *Kumho Tire*. *Id.*

"The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Id.* at 1181. To assist in the assessment of reliability, the Supreme Court in *Daubert* listed four nonexclusive factors that courts may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. 509 U.S. at 593-94. District courts applying *Daubert* also "have broad discretion to consider a variety of other factors." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (citing *Kumho Tire*, 526 U.S. at 150).

Ultimately, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee notes to 2000 amendment. "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* (quoting *United States v. 14.38 Acres of Land Situated in Leflore County*, 80 F.3d 1074, 1078 (5th Cir. 1996)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

If a witness is not testifying as an expert based on scientific, technical, or other specialized knowledge within the scope of Rule 702, the witness may still offer testimony in the form of an opinion so long as the opinion is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701.

**B.  Analysis**

Kong intends to offer Mr. Nelson as both a fact and opinion witness, and it correctly recognizes that when it comes to opinion testimony, the line between lay opinion and expert opinion is not always clear. *See United States v. Draine*, 26 F.4th 1178, 1187 (10th Cir. 2022). It is permissible for the same witness to provide both lay opinion and expert opinion testimony. *Id.* "For example, the owner or officer of a business may testify to the value of property or expected profits without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." *Tomelleri v. Zazzle, Inc.*, No. 13-CV-02576-EFM-TJJ, 2015 WL 8375083, at *5 (D. Kan. Dec. 9, 2015) (citing Fed. R. Evid. 701 advisory committee notes to 2000 amendment). Such opinion testimony is admissible "not because of experience, training, or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701 advisory committee notes to 2000 amendment. Kong is correct that to some extent, the lines between fact, lay opinion, and expert opinion testimony will need to be policed in context at trial, but I attempt here to give the parties guidance as to my views on where the lines of admissibility should be drawn.

To the extent that Mr. Nelson's testimony falls within the realm of expert opinion testimony, I find, as to the first admissibility factor, that he is qualified "by knowledge, skill, experience, training, or education" to opine regarding the topics for which he has been designated. Fed. R. Evid. 702. As Kong's disclosures note, Mr. Nelson has been an owner and manager of Kong for over twenty years, he oversees all the company's operations, and he has won multiple industry awards. Doc. 89-1 at 4. He is also an owner and manager of KVP, which previously held the role that the parties discussed KSP taking over. *Id.* His experience

managing Kong, which designs, manufactures, and sells pet-toy products, qualifies him to opine regarding the market for pet-toy products, consumer preferences regarding pet-toy products, and Kong's trademarks and overall brand and goodwill in the marketplace, and his testimony will help the jury to understand the evidence and determine disputed facts in those areas. *See United States v. Gomez*, 67 F.3d 1515, 1525-26 (10th Cir. 1995) (Rule 702 qualification standard is a liberal one); *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (10th Cir. 2006) (expert is qualified if he possesses "knowledge, skill, experience, training, or education" sufficient to "advance[] the trier of fact's understanding to any degree" (quoting 29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6265 (2d ed.))). Any perceived gaps in Mr. Nelson's knowledge, experience, or training—*e.g.*, his lack of "academic training or certifications in marketing," Doc. 89 at 7, 9—are fodder for cross-examination and go to the weight of his testimony, not its admissibility. *See Robinson*, 447 F.3d at 1100.

As to the second admissibility factor for expert opinions—whether Mr. Nelson has employed a reliable methodology in forming his opinions, and whether his opinions are based on sufficient facts or data—I find that for the most part his opinions are sufficiently reliable. For example, the defendants take issue with Mr. Nelson's opinions regarding the market for pet-toy products, arguing that he has not identified any consumer research reports that he relied on or performed any consumer surveys. But Mr. Nelson has managed Kong for over twenty years, and he testified that he has "spent 40 years talking to consumers." Doc. 89-2 at 13. He has a sufficient basis to testify as to his knowledge of the types of pet-toy balls that were on the market at different points in time, as well as to his experiences and opinions regarding consumer behaviors and preferences in the pet-toy market. The defendants remain free to cross-examine him regarding the foundation for that testimony and any

contrary market research or other contrary evidence. *See Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination [and] presentation of contrary evidence" are the appropriate remedy). Mr. Nelson may also testify to the fact that Kong has been valued at approximately $200 million at one point in time and that it has received offers to buy the company for that and greater amounts, as those facts are within his knowledge as one of Kong's long-time managers. And, Mr. Nelson has sufficient foundation to offer testimony regarding Kong's style guide and other policies that govern how its distributors and retailers may use its trademarks and display its products in stores, the reasons behind those policies, the types of effects on Kong's brand and customer goodwill that may occur or have occurred when those policies are not followed, and any knowledge he has regarding specific effects on Kong's brand and customer goodwill caused by the defendants' alleged misuse of Kong's trademarks. *See, e.g.*, Doc. 89-2 at 9-10.

But Mr. Nelson's quantification of the effects of the defendants' alleged infringement, *i.e.*, his opinion that Kong has suffered $2 million in damages due to loss of brand reputation and customer goodwill, is not supported by a reliable methodology or sufficient facts. Mr. Nelson testified that he estimates Kong has suffered a 1% decline in its overall value as a result of the defendants' conduct. To begin with, it is not clear that a decline in a company's overall total value is an acceptable measure of actual damages for trademark infringement.[7] *See, e.g.*, 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:57 (5th ed.) (listing "trademark owner's actual commercial damages and losses caused by the infringement"; "trademark owner's own loss of

---

[7] The applicable statute allows recovery of both (1) "defendant's profits," and (2) "any damages sustained by the plaintiff." 15 U.S.C. § 1117(a). Mr. Nelson's opinion pertains only to the latter. Doc. 95 at 12.

profits caused by the infringement"; cost of "corrective advertising needed to undo the confusion and deception"; and "a reasonable royalty for the unpermitted use of the mark" as recognized measures of actual damages). But even if so, Mr. Nelson has not provided a sufficient factual basis for that opinion. He did not, for instance, testify that Kong was valued at $200 million when the defendants' alleged infringement began and at $198 million when it ceased. Instead, he testified in broad strokes that the defendants' alleged misconduct has caused Kong to divert energy and focus toward defending its trademark rights and protecting its brand, which has had an effect on morale, sales, and profitability, and that after speaking with various members of Kong's core management group, he estimates that Kong has lost at least 1% of its value. Doc. 89-2 at 4-14. But that 1% estimate is not grounded in any facts other than Mr. Nelson's say-so. *See id.* Nor did he give any testimony that would tie the company's internal loss of energy, focus, and morale to an external loss of reputation or customer goodwill. *See id.*; *First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1087 (D. Kan. 2000) (plaintiff must prove it has been damaged by actual consumer confusion or deception resulting from the violation).[8]

Kong argues that "[w]hile simplistic and straightforward, Mr. Nelson's damages calculation is consistent with the legal requirements for calculating damages in trademark infringement cases." Doc. 95 at 14. It

---

[8] *Cf. Committee for Idaho's High Desert v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) ("No authority suggests that a plaintiff's time spent in litigation over trademark infringement is compensable as damages for the infringement."); *BBC Grp. NV LLC v. Island Life Rest. Grp. LLC*, No. C18-1011 RSM, 2020 WL 758070, at *5 (W.D. Wash. Feb. 14, 2020) (even if individual business owners may recover emotional-distress damages caused by defendant's infringement, they may only recover for "emotional harm from the infringement and [not] emotional harm from the litigation").

is true that once the fact of damages has been proved, courts are willing to accept "crude" measures of actual damages, *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112-13 (9th Cir. 2012), in light of the "inherent[] difficult[y] [in] calculat[ing] . . . damage to goodwill, an intangible property right," *I Can't Believe It's Yogurt v. Gunn*, No. Civ.A. 94-OK-2109-TL, 1997 WL 599391, at *17 to *18 (D. Colo. Apr. 15, 1997). Even so, there must some basis for the proffered measure, *i.e.*, "substantial evidence to permit the jury to draw reasonable inferences and make a fair and reasonable assessment." *Skydive*, 673 F.3d at 1112; *accord King & King Enters. v. Champlin Petrol. Co.*, 657 F.2d 1147, 1157 (10th Cir. 1981) ("There must be reasonable evidence from which a jury can rationally infer the amount of damages."). Damages may not be speculative. *King*, 657 F.2d at 1157 (noting that in *Gray v. Shell Oil Co.*, 469 F.2d 742 (9th Cir. 1972), "the figures which the accountant was given by the plaintiffs as a basis for his calculations of lost profits were based on plaintiffs' 'feelings' that they were entitled to additional margins of profit, and the purely speculative claim that their retail gas prices could have been raised six cents per gallon without any resultant loss in the volume of gasoline sales"); *accord Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407-08 (9th Cir. 1993) (collecting cases). Indeed, "damages awards turn out to be comparatively rare in trademark cases primarily, it appears, because of the difficulty of proving them." *Fisherman Transducers, Inc. v. Paul*, 684 F.3d 187, 194 (1st Cir. 2012) ("[P]roving causation and amount are very difficult . . . and most cases . . . involve an attempt to recoup the infringer's profits."); *accord Lindy Pen*, 982 F.2d at 1407 ("proof of actual damage is often difficult").

Mr. Nelson's "1% of $200 million" estimate is the type of testimony that is "merely a basis for jury speculation" and must be excluded. *See Fisherman*, 684 F.3d at 194-95 (affirming district court decision to

exclude (1) expert testimony that did not "suppl[y] the jury with data from which it could make an intelligent estimate of [the plaintiff's] damages," and (2) company founder's testimony about the cause of damages, finding that "even taken together . . . this evidence would not allow a reasonable jury to assess damages" or "make even a crude estimate of diverted sales").

## CONCLUSION

It is **ORDERED** that:

Plaintiff's Motion for Summary Judgment on Defendants' Invalidity Defense, **Doc. 83**, is **GRANTED IN PART**. Assignor estoppel bars the defendants from asserting invalidity defenses except for obviousness;

Defendants' Motion for Partial Summary Judgment, **Doc. 87**, is **DENIED**;

The defendants' Motion to Exclude Expert Testimony of John Nelson, **Doc. 89**, is **GRANTED IN PART** as outlined above; and

Defendants' Unopposed Motion to Restrict Access, **Doc. 90**, is **GRANTED IN PART**. The defendants seek to restrict public access to the rebuttal report of their damages expert because it contains confidential business and financial information. The defendants have not shown that redaction or restricting access to only portions of the report is impracticable or would not adequately protect the confidentiality interests at stake. *See* Local Civ. R. 7.2(c)(4). Accordingly, the defendants must file a public redacted version of the report within **fourteen days** that redacts any confidential information. The Clerk of Court is directed to maintain Doc. 86 under Level 1 restriction.

DATED: March 27, 2025         BY THE COURT:

~~Daniel~~ D. Domenico
United States District Judge